The opinion of the majority of the court was delivered by
Gaston, Judge.
After an anxious consideration of this case, the court is unable to find any grounds, on which to pronounce the judgment, rendered against the prisoner, erroneous.
The only error alleged is, because of misdirection of the presiding Judge in his instructions to the jury. It has not been questioned, nor can it be questioned, but that it is the *358 duty 0f a judge, who presides at the trial of a cause, whetfaer civil or criminal, to correct every misrepresentation oflaw made to the jury, although admitted to be law by the pnrt¡es or t[íe¡r counsel. He does not preside merely as a moderator, to enforce order and decorum in a discussion addresstp a body, with whose deliberations he has no concern, over whose judgment he is'to exercise no influence; but he is an integral part of that mixed tribunal, whiclr is to pass upon the issue, and, while he is forbidden to give to the jury « an opinion whether any fact is sufficiently proven,” he J 1 J J 1 . 7 is bound to declare and expound to them the law arising upon those facts. Rev. Stat. c. 31, s. 136.
ji is ti.e any cause, cv.Toi-1 cnminai, to correct any misivprelaw am°("e°f aiihoujh'^ beTaw'by*0 the parties O'* the r counsel,
The alleged error is supposed to be, partly in the instruc^0118 actually given, and partly in declining to adopt, as a modification of those instructions, certain positions, for which. , _ . . . 1 the prisoners counsel contended on the trial.
The instruction given, to which objection has been taken, is that part of his Honor’s charge, wherein, after stating that the provocation, testified to by Pollard, was sufficient in law to reduce the killing to manslaughter, he added, “ that, nevertheless, if, connecting the testimony of Polly Mnngmn with all the other evidence in the cause, they could collect the fact, that the deceased was the object of the threat deposed to by her, and that the prisoner went to the shop (where the homicide was committed) with the intention to provoke a quarrel with the deceased, in order to gratify his avowed vengeance, then the killing was murder, notwithstanding the facts proved by Pollard.” In support of-this objection, it has been argued that a jury cannot collect any fact from evidence, unless such evidence will rationally authorise the inference of the fact, that it is error in law to leave it to them to collect a fact, of which no testimony has been given, or none b.ut of a vague and plainly insufficient character. — and that, in the case under consideration, there was no testimony to warrant a finding that the denunciation of the prisoner was directed to the deceased; and, if possible, yet less that he went to the shop with intent to bring on a quarrel to gratify his avowed vengeance. To us it seems that there was e *359 vidence fully warranting the jury in inferring the whole fact, the existence or non-existence of which was left to their judg' ment. It was not a vague threat, which the prisoner uttered. He avowed his determination to kill an individual, whom, however, he refused to name, and to kill him that night; and he exhibited the instrument, which he had prepared to carry this purpose into execution; andón that night, with that instrument of death concealed, he goes to the shop of which the deceased has the charge, gets into a quarrel with him, and, at the time and in the manner previously declared, unlawfully kills him. Upon this, the inference that the deceased was the person whom he had previously resolved to kill, becomes irresistible, until there be some facts to repel it. An act was done precisely of the kind which, but a few hours before, he had resolved to do, and prepared the means to execute; and it was done at the time determined on and with the means prepared; and the conclusion ■must be that this was the act so designed, unless thex'e be some indications that a different act of the same kind was contemplated. What was the evidence to repel this conclusion? No more than this: that, immediately before the deed was committed, he received from the deceased such a provocation as would have been sufficient, if there had been no malice, to excite high passion. Admit that this fact had some tendency to weaken the inference, to render it somewhat less conclusive, it, nevertheless, left the question of fact, who was the object of his vengeance, one fit for the determination of the jury. It is to be remembered' that vocation never disproves malice; it only removes the , 1 i j j sumption of malice, which the law raises without proof. malicious killing is murder, however gross the provocation. But it is argued that, as the act of killing in this case followed immediately after provocation, the legal presumption from the act is that it was committed without malice, and therefore it cannot be l-egarded as evidence at all to establish malice. The answer is, that the act’ of killing was not relied on as evidence of malice. There was proof, aliunde, of malice, of a fixed determination to kill. The act of killing, like any other act, corresponding in its circumstances with a *360 previously ascertained purpose, is evidence, because of this conformity, to designate the object of the intended action, and therefore, though not proof of malice, it may point out the direction of ascertained malice. If in a crowd, I tread on a man’s toes, it may well be presumed that the act was accidental; but if it appear that I went into the crowd with the purpose to render that insult to some person, then certainly the act would be evidence to point out the individual whom it was my purpose to insult.- In forming a judgment upon the question, how far the fact of provocation weakened the inference that the deceased was the object of the avowed vengeance of the prisoner, there were other circumstances in the case proper to be taken into consideration. It appeared that the deceased had been employed to keep a shop in Raleigh, belonging in part to the father of the prisoner. The only intimation, previously given, of the unnamed object of his enmity is tobe found in the exclamation, “is it not a shame that I should have to work all day in the hot sun?” That night, at the shop, when' forbidden by the deceased to sleep there, he exclaimed “it is hard that I cannot go to bed in my father’s house.” And, after the fatal deed was done, instead of expressing sorrow for a rash act, committed in the heat of passion, he uttered a horrid wish and imprecation, indicative of a deep-rooted hatred against the deceased. These circumstances, connected with the fact that, on the part of the prisoner, nothing was shewn, tending in the slightest degree to designate any other object of his vengeance, seem to point out the deceased as the person, who, supplanting him in his father’s shop, being placed in an easy situation, while he was obliged to toil “ all day in the hot sun,” was regarded by him with the deadly hostility thus avowed, executed and unrepented of.
*359 proves imuú only ™esiimp- *e “'.I1"1" the law 4 “"Ik. is murever gross ^“T™70"
*360 But admitting that the deceased was the object of the prisoner’s vengeance, it is denied that there was evidence to warrant a finding that the prisoner went to the shop with intent to provoke a quarrel and gratify his vengeance. For reasons, which will hereafter be assigned, we hold that the charge would have been perfectly correct, had it omitted the inquiry as to an intent to provoke a quarrel, but had left the *361 question of murder to depend solely on the fact, whether he went to the shop with the intent to kill the deceased. But we are entirely satisfied that the circumstances were relevant and fit to be considered, if the enquiry were material, upon the question of intent to provoke a quarrel. Let us advert for a moment to the most material of those circumstances.
The prisoner has formed a purpose of most deadly vengeance against the deceased, and prepared the means to execute it. With these means concealed,- he goes to the place where the deceased is ordinarily to be found. The first act he is engaged in, after arriving there, is a quarrel with a third person. This quarrel the deceased had a right to suppress, and does suppress. But the prisoner treats this conduct as the taking of a part in the quarrel against him. The next act is an attempt to take possession of the bed-roomj connected with the shop. The case does not state that this was the bed-room of the deceased, and, however probable the presumption that such was the fact, we do not feel ourselves authorized to assume it. But it is not pretended it was the bed-room of the prisoner; it is not shewn that he had ever occupied it, or had any right to occupy it; and indeed the only pretence of right set up by him was, that his father was one of the owners of the shop. Unquestionably the deceased, who represented the owners of the shop and was clothed with their rights, was fully justified in forbidding this assumption of dominion there, and. the perseverance in such assumption was a rude and insulting act. If the deceased, upon this, had done no more than turn him out of doors, the deceased would have bee'n wholly blameless in the transaction. But according to the testimony of Poilard, (which for the purposes' of the present enquiry must'be presumed to be true,) in turning him out of doors, he kicked the prisoner and was instantaneously shot. Now, it is not for us, nor was it for the Judge below, to draw the conclusion of fact, that the prisoner did go to the shop, with the intent to bring on a quarrel and execute the purpose of death, which he had formed against the deceased; but if the intentions of men are to be ascertained by their acts, these acts of the prisoner were fit for the consideration of the jury, to enable them to *362 what was his intent. He had resolved to kill; he went prepared to kill; he brought on a quarrel with the object of his vengeance, and in that quarrel did kill him. Can it be questioned that it is a proper enquiry, did he intend what happened?
We have said that the enquiry, whether the prisoner intended to bring on a quarrel, was not a material one for determining on the character of his crime. We take the principle to be clear, that when a deliberate purpose to kill, or to do great bodily harm, is ascertained, and there is a consequent unlawful act of killing, the provocation, whatever it may be, which precedes the act, is to be thrown out of the case and goes for nothing, unless it can be shewn that this purpose was abandoned before the act was done. There can be no such thing in law as a killing with malice, and also upon the furor brevis of passion; and provocation furnishes no extenuation, unless it produces passion. Malice excludes passion. Passion presupposes the absence of malice. In law they cannot co-exist. Murder is the killing with malice aforethonght. If there be killing, and malice aforethought be shewn, both-of the constituents of the crime are established, and the act is murder. Certainly, however, it must be admitted that the most determined purpose to kill may be repented of, and malice, however, deeply settled, may be abandoned. But there must be something to shew that this has been done, before it is presumed. There is a locus, or rather a tempus, penitent-ice allowed, but to avail any thing it must be employed for repentance, and repentance of a criminal purpose is not presumed, if the act be done, which that pur. pose contemplated. It is not therefore the legal presumption, where a provoeation intervenes between the expression of malice and the act of killing, that the slaying was upon passion and not upon malice. The authorities relied upon to establish this position, when fairly interpreted, lay down the opposite doctrine, that the presumption in such cases is, unless there be proof to the contrary, that the killing was upon malice and not upon passion. It is admitted that the passage produced from Mr. East, a very respectable compiler of the criminal law, taken per se, does favor the view pressed by the *363 prisoner’s counsel. His languageis, “But where fresh vocation intervenes between preconceived malice and the' death, it ought clearly to appear that the killing was upon the antecedent malice; which may be difficult in some cases to shew satisfactorily, if the new provocation were a grievous one. In such cases, says Hawkins, it shall not be presumed that they fought on the old grudge, unless it appear by the whole circumstances of the fact.” 1 East. c. 5, s. 12. It is to be remarked, however, in the first place, that this passage is the concluding part of a section, wherein he has been considering how far aprovocation received may rebut an implication of malice; and, after laying down the proposition that a provocation, immediately preceding the act, will rebut that implication, “ but that it will be no answer in alleviation to express malice proven,” he proceeds to state that “therefore, if, upon a provocation received, one party deliberately and advisedly denounce vengeance against the other, and afterwards carry his design into execution, he will be guilty of murder, although the death happened so recently after the provocation, as that the law might, apart from such evidence of express malice, have imputed the act to unadvised passion:” and then follow, as a qualification or exception, the words first quoted. Taking, therefore, the whole section, its meaning is this:— provocation will not extenuate a killing to manslaughter, although the act speedily follows upon the provocation, and before the blood, if raised to the boiling point of passion, has time to cool, if, from the advised and deliberate expression of malice it can be collected thatjbe blood was not thus heated by that provocation: but if no act of killing then take place, and an additional provocation be received, and thereupon the person so provoked slay his adversary, it is a fair presumption, unless the circumstances of the fact shew the contrary, that iAissuperaddedprovocation did produce such highly excited passion, and the act of slaying proceeded from this passion. Thus understood, it does not conflict with the' views we have taken. But Mr. East, in this passage refers to Hale and Hawkins, who are justly regarded, notas respectable compilers, but as standard authorities; and what is their language? Mr. East, refers to Hawkins, Book 1, ch. 13, sec. 29, *364 30 (page 97.) Hawkins’ word? are, “ If two happen to fall out upon a.sudden and presently agree to fight, and each of them fetch a weapon, and then one kills the other, he is guilty 0p manslaughter only, because he did it in the heat of blood. And such an indulgence is shewn to the frailties of human nature, that where two persons, who have formerly fought on malice, are afterwards to all appearance reconciled, and fight again on a fresh quarrel, it shall not be presumed that they were moved by the old grudge, unless it appear by the whole circu instances of the fact.” Mr. East, refers also to 1 Hale’s Pleas of the Crown, 452. The entire passage in Hale is this: “ If there be an old quarrel between A. and B. and they are reconciled again, and then upon a new and sudden falling out A. kills B., this is not murder; but if upon circumstances it appears that the reconciliation was but pretended or counterfeit, and that the hurt done was upon the force of the old malice, it is murder.” Here we have the true doctrine. The act shall be attributed to passion produced by provocation, and not to the old grudge, if it appear that the old grudge has ceased. One of the cases put by Hale on the next page is, it would seem, decisive of this point. “ If A. challenge B. to fight; B. declines the challenge, but lets A. know that he will not be beaten, but .will defend himself; if B., going about his occasion, wears his sword, is assaulted by A. and killed, this is murder in A.; but if B. had killed A. upon that assault, it had been se def endeudo, if he could not otherwise escape; or bare homicide, if he could escape and did not. But if B. had only made this a disguise to secure himself from the danger of the law, and purposely went to the place, where probably he might meet A., and then they fight and he kills A., then it had been munder in B.; but herein'circumstances of the fact must guide the jury.” If B. had formed no determination to fight, but intended only self-defence, and met A. accidentally, then the assault upon him would have excused the act of killing altogether, if necessary to his own safety, or extenuated it to manslaughter, if not required by such necessity. But if in truth, notwithstanding his declaration to the contrary, he had formed the purpose to fight, and went to the place to execute *365 that purpose, such an assault would be no excuse or tion, and his crime would be murder; and the enquiry for the jury is, from the circumstances, was it his purpose to fight, and did he go with that purpose? Such is regarded settled law iti the courts of England at this day, where, in consequence of the numerous cases which call for the exercise of great .legal discrimination, precision in the rule on this subject may justly be expected. In the late case of the Queen v. Kirkham, reported 8 Car. & Pay. 115 (34 E. C. L. R. 318,) where a father stood indicted for the murder of his son, it appeared in evidence that the act of killing was preceded by such an immediate act of provocation, as would extenuate the crime to manslaughter, unless malice was shewn. The crime was committed on Saturday, and testimony was given of threats to kill the deceased, uttered by the prisoner on the preceding Monday and Wednesday. The jury was instructed that the question of manslaughter or murder depended upon the fact, whether these threats were the mere ebullitions of momentary anger, or the expressions of a deliberate purpose; “so that if they believed that on the Monday or Wednesday before, the prisoner used the threats deliberately, then all the quarrelling and wrestling might be dismissed from their consideration.’!
In the observations made upon the objections to the instruction given, we have unavoidably anticipated much that is applicable to the other objection, because of instruction not given. . It will be sufficient for us now to remark, in relation to this objection, that provocation, as such, is not an extenuation of the act of killing, although passion, consequent upon provocation, may extenuate; that the true question is, whether the act be the result of such passion or of malice; and that the relation of good or ill will, prevailing between the parties, is all important in leading to the decision of that question; and that when the existence of deliberate malice in the slayer is once ascertained, its continuance, down to the perpetration of the meditated act, must be presumed, until there is evidence to repel it. What that evidence should be it is hazardous to define.- But there must be some evidence, and, without it, the jury cannot rightfully *366 or court give an instruction implying that they may find, a discontinuance of deliberate malice. If a considerable period of time has elapsed, between the last indications 0f the wicked purpose and the killing; if convenient opportunities for gratifying vengeance have passed over, and no use was attempted to be made of them; if an apparently amicable intercourse has taken place between the parties in the mean-while; these, and such as these, would be circumstances well worthy of the consideration of the jury, as tending to shew a change of intention. True, it is in the power of Him, in whose hands are the hearts of his creatures, to effect this change in the twinkling of an eye, and He alone can know with certainty whether it hath or hath not been made. But men, fallible men, obliged to judge of human motives, and yet having no means of judging but by external indications, are compelled to pronounce the unlawful deed the -consequence of the wicked purpose, unless there be some evidence, which their understandings can discern, that such purpose had been relinquished. In the case before us there is one thing, which we can pronounce with certainty. If the prisoner did go to the place, where he killed the deceased, with intent to kill him; and so the jury have found, and so in our opinion they were warranted to find, there was no evidence, however slight, shewing, or tending to shew, that this intention was abandoned, before the act was done. The decision of this court must be certified to the Superior Court of Wake, with directions to proceed to judgment and sentence of death against the prisoner, agreeably thereto, and the laws of this State.